1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                        DISTRICT OF NEVADA

8                                * * *

9   WESTERN WATERSHEDS PROJECT,        )
                                       )
10              Plaintiff,             )        03:06-CV-00527-LRH-RAM
                                       )
11  v.                                 )
                                       )        ORDER
12  BUREAU OF LAND MANAGEMENT AND )
    U.S. FISH AND WILDLIFE SERVICE,    )
13                                     )
                Defendants.            )
14  _____   )

15          Presently before the court are cross-motions for summary judgment.  First, a Motion for

16  Partial Summary Judgment (# 44) was filed by plaintiff, Western Watersheds Project ("WWP").

17  Defendants, Bureau of Land Management and U.S. Fish and Wildlife Service ("Defendants") filed

18  an opposition (# 56), and WWP replied (# 54).

19          Defendants have also filed a Cross-Motion for Summary Judgment (# 55).  WWP has filed

20  an opposition (# 53), and Defendants replied (# 61).

21  **I.  Factual Background**

22          This action challenges the decision of the Bureau of Land Management ("BLM") to amend

23  two resource management plans for public lands located in Elko County, Nevada on the grounds

24  that the agency violated the National Environmental Policy Act and the Endangered Species Act.

25  WWP is an Idaho non-profit membership organization dedicated to protecting and conserving the

26  public lands and natural resources of the American West.

The Elko District consists of 7.5 million acres of land administered by BLM.  (Admin. Record at 578.)  BLM's management of public lands in the district is governed by two resource management plans ("RMPs").  (Admin. Record at 3096-3149, 3938-3965.)  The Elko RMP covers the western portion of the district, and the Wells RMP covers the eastern portion of the district.  *Id*. at 9.

In 1995, the Federal Wildland Fire Management Policy was developed as the first single comprehensive federal fire policy for the Departments of the Interior and Agriculture.  *Id*. at 522, 1512.  The Elko Field Office is one of the higher fire load Field Offices within BLM.  *Id*. at 4708. A new Fire Management Plan ("FMP") was developed in 1998 to attempt to return fire to its natural role in the ecosystem.  *Id*. at 4705.

In October, 2003, BLM determined that the RMPs and current 1998 Fire Management Policy did not provide adequate direction for fire management.  *Id*. at 522.  As a result, BLM amended the RMPs.  *Id*.  The amendment was intended to provide direction and continuity in establishing operational procedures to guide all fire management activities.  *Id*.  An environmental assessment ("EA") was completed in October, 2003.  (Admin. Record at 516.)

The alternatives analyzed in the EA consisted of four components: general fire management, fire prevention, fire suppression, and fire rehabilitation.  *Id*. at 528.  The EA notes that the components were guided by existing documents.  *Id*.

BLM initiated public involvement with the publication of a Notice and Intent in the Federal Register on April 24, 2001.  *Id*. at 16.  The Elko Field Office also mailed newsletters to 730 individuals, agencies and groups, issued a news release and ran radio announcements to notify the public of scoping meetings.  *Id.*  The scoping meetings were held September 25, 26, 26 and 28, 2001.  *Id*.  BLM also used newsletters and media releases to notify the public of a second round of meetings that occurred on May 20, 21, 22, 23, 2002.  *Id*.

BLM circulated a draft FMA/EA for public review in September, 2002.  *Id*. at 17.  The

comments received were used to prepare a Proposed FMA/EA, which was released in October, 2003.  (Admin. Record at 17.)  BLM issued a finding of no significant impact on October 14, 2003. *Id*. at 513-15.  WWP and Goods from the Woods, a company that works with pine nuts harvested from BLM lands in Nevada, protested the Fire Amendment.  *Id*. at 8410-27.  BLM dismissed both protests in their entirety.  *Id*. at 18.  BLM subsequently issued the Fire Management Amendment and Decision Record on September 29, 2004.  *Id*. at 1-74.

**II.  Legal Standard**

    **A. Summary Judgment**

    Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

    The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).  For those issues where the moving party will not have the burden of proof at trial, the movant must point out to the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325.

    In order to successfully rebut a motion for summary judgment, the non-moving party must

point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

**B.  The APA**

Plaintiffs filed this action, in part, pursuant to the judicial review provisions of the Administrative Procedures Act ("APA"). The APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ." 5 U.S.C. § 706(2). "An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to governing law." *The Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citations omitted). The standard requires the court to give deference to an agency's findings. *Akiak Native Cmty. v. U.S. Postal Service*, 213 F.3d 1140, 1146 (9th Cir. 2000) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989)). The party challenging agency action bears the burden of proof. *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (citing *Nat'l Ass'n of Regulatory Utility Comm'r v. F.C.C.*, 746 F.2d 1492, 1502 (D.C. Cir.

4

1  1984)).

2  **III. Discussion**

3     WWP alleges several violations of the National Environmental Policy Act ("NEPA") and

4  seeks summary judgment on each.  Specifically, WWP alleges BLM's decision to prepare an EA

5  and Finding of No Significant Impact ("FONSI") was predetermined.  WWP further argues the EA

6  does not analyze the affected environment, the direct, indirect and cumulative impacts of the fire

7  management, and that it inappropriately tiers to plans and other documents that are old, have never

8  been updated and/or never underwent NEPA analysis and review.  Finally, WWP argues an

9  Environmental Impact Statement ("EIS") should have been prepared.  Defendants also seeks

10  summary judgment on all the NEPA causes of action.  In addition, Defendants seek summary

11  judgment on claims for relief brought pursuant to the Endangered Species Act.  The court will

12  address the alleged violations and the parties' arguments below.

13     **A.  Standing**

14     Defendants first argue WWP lacks standing to bring this action.  Specifically, Defendants

15  argue the Complaint fails to point to any injury to WWP's members and fails to identify an injury

16  to a concrete interest of the organization.  WWP contends that one of its members and employees,

17  Kathleen Fite, has suffered an injury to a concrete interest.  WWP further argues the interest it

18  seeks to protect is germane to its purpose.

19     The Supreme Court has held that Article III requires a plaintiff to show the following in

20  order to satisfy standing:

21     (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b)
      actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable
22     to the challenged action of the defendant; and (3) it is likely, as opposed to merely
      speculative, that the injury will be redressed by a favorable decision.
23
   *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)
24
   (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  In addition, a plaintiff
25
   alleging a violation of NEPA must show that his injury falls within the "zone of interests" that
26

1    NEPA was designed to protect.  *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111-12 (9th

2    Cir. 2002) (citing *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001)).

3         An organizational plaintiff may have standing based on an injury to itself or one of its

4    members.  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  "[A]n association has standing to bring suit

5    on behalf of its members when: (1) its members would otherwise have standing to sue in their own

6    right; (b) the interest it seeks to protect are germane to the organization's purpose; and (c) neither

7    the claim asserted nor the relief requested requires the participation of individual members in the

8    lawsuit."  *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  An

9    organization may have standing based on the allegations of a single member.  *Ecological Rights*

10   *Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1150 n.10 (9th Cir. 2000).

11        The Supreme Court has held that "environmental plaintiffs adequately allege injury in fact

12   when they aver that they use the affected area and are persons 'for whom the aesthetic and

13   recreational values of the area will be lessened' by the challenged activity."  *Friends of the Earth*,

14   528 U.S. at 183; *Ecological Rights Found.*, 230 F.3d at 1147 ("The 'injury in fact' requirement in

15   environmental cases is satisfied if an individual adequately shows that she has an aesthetic or

16   recreational interest in a particular place, or animal, or plant species and that that interest is

17   impaired by a defendant's conduct.").

18        To demonstrate standing, WWP has provided a declaration from its member and

19   Biodiversity Director, Kathleen Fite ("Fite").  Defendants challenge this declaration arguing it is

20   incompetent evidence because it has not been signed.  The court finds the Fite declaration is

21   admissible pursuant to 28 U.S.C. § 1746.  Section 1746 permits the use of unsworn declarations

22   provided the declarant state such information under penalty of perjury.  *Id*.  Here, the Fite

23   declaration meets these requirements and contains an indication of an electronic signature.  *See*

24   (Pl.'s Resp. to Defs.' Cross-Mot. (# 53), Second Decl. of Fite.)

25        Looking at the evidence provided in this case, the court finds WWP has sufficiently

26                                              6

1   demonstrated standing.  Fite began working for WWP as the Biodiversity Director in September,

2   2003.  (Pl.'s Resp. to Defs.' Cross-Mot. (# 53), Second Decl. of Fite ¶ 11.)  Furthermore, Fite has

3   been a member of WWP "almost since its inception in the mid-1990s. . . ." *Id*.  Defendants argue

4   this portion of Fite's declaration is insufficient because it does not explicitly state she was a

5   member when the complaint was filed.  Nevertheless, the court finds the language used by Fite

6   indicates Fite was, in fact, a member of WWP at the time the complaint was filed.

7       The declaration indicates Fite has visited and explored many of the public lands in Nevada,

8   including the Elko District, for the past 20 years.  *Id*. ¶ 15.  In addition, Fite regularly camps, hikes

9   and enjoys recreational outings on BLM lands throughout the Elko District.  *Id*. ¶ 16.  Fite has

10  indicated she enjoys the aesthetic, scientific and recreational values of the sagebrush, pinyon-

11  juniper and aspen vegetation communities in the area.  *Id*.  In addition, she enjoys the streams,

12  wetlands and riparian areas.  *Id*.  Fite states she will continue to explore the public lands

13  throughout the Elko District.  *Id*. ¶ 19.

14      Fite's declaration further indicates her "recreational, aesthetic and scientific use and

15  enjoyment of the lands throughout the Elko District . . . will be lessened by BLM's Fire

16  Management Amendment because it authorizes the drastically expanded use of vegetation

17  'treatments' such as logging, chaining, burning, bulldozing and otherwise destroying the area's

18  native vegetation and bird and wildlife habitat." *Id.* ¶ 37.  Fite also claims the project will increase

19  the spread of invasive plant species and degrade the habitat for threatened, endangered and

20  sensitive species.  *Id*. ¶ 38.  The foregoing allegations of Fite indicate she uses the lands in the Elko

21  District and suffers an injury as a result of the Fire Management Amendment.

22      With regard to NEPA, the specific injury is a procedural one.  "NEPA is a procedural

23  statute, and thus it is not surprising that procedural injuries suffice for standing in the NEPA

24  context."  *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005).  Plaintiffs

25  asserting a procedural injury must show that the "'procedures in question are designed to protect

26

7

some threatened concrete interest of his that is the ultimate basis of his standing.'" *Id*. (quoting *Lujan*, 504 U.S. at 573 n.8.).  In claims brought pursuant to NEPA, the concrete interest test requires a "geographic nexus" between the individual asserting the claim and the location suffering an environmental impact.  Here, WWP has alleged such a geographic nexus be showing that Fite uses and enjoys public lands in the Elko District.  *See Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 971-72 (9th Cir. 2003).

The court further finds that the interest WWP seeks to protect is germane to WWP's purpose.  WWP has provided evidence that its mission is to "protect and restore western watersheds and wildlife through education, public policy initiatives and litigation."  (Pl.'s Resp. to Defs.' Cross-Mot. (# 53), Second Decl. of Fite ¶ 12.)   Furthermore, WWP has indicated it "enables public lands agencies to manage in accord with the public interest by ensuring that management upholds its legal obligations to make decisions based on verifiable science."  *Id*.  The court finds these allegations sufficient to demonstrate the interest WWP seeks to protect in this case is germane to its purpose.  For the foregoing reasons, the court finds WWP has standing.

**B.  NEPA**

"NEPA is a statute that aims to promote environmentally sensitive governmental decision-making, without prescribing any substantive standards."  *Anderson v. Evans*, 314 F.3d 1006, 1016 (9th Cir. 2002), *amended and superseded on other grounds by* 371 F.3d 475 (9th Cir. 2004) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989)).  The policy goals of NEPA are "realized through a set of action forcing procedures that require that agencies take a hard look at environmental consequences, and that provide for broad dissemination of relevant environmental information."  *Robertson*, 490 U.S. at 350 (citations and internal quotations omitted).  "NEPA's goal is satisfied once the information is properly disclosed; thus, NEPA exists to ensure a *process*, not to ensure any result."  *Inland Empire Public Lands Council v. U.S. Forest Service*, 88 F.3d 754, 758 (9th Cir. 1996) (citing *Robertson v. Methow Valley Citizens Council*, 490

1    U.S. 332, 350 (1989)).

2    Pursuant to NEPA, a federal agency must prepare an Environmental Impact Statement

3    ("EIS") for all "proposals for legislation and other major Federal actions significantly affecting the

4    quality of the human environment."  42 U.S.C. § 4332(2)(C); *Klamath-Siskiyou Wildlands Ctr. v.*

5    *Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004).  "An EIS is a thorough analysis of the

6    potential environmental impact that 'provide[s] full and fair discussion of significant

7    environmental impacts and . . . inform[s] decisionmakers and the public of the reasonable

8    alternatives which would avoid or minimize adverse impacts or enhance the quality of the human

9    environment.'" *Id.* (citing 40 C.F.R. § 1502.1).

10   As a preliminary step to preparing an EIS, "the agency may prepare an [EA] to determine

11   whether the environmental impact of the proposed action is significant enough to warrant an EIS.

12   *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (citing *Nat'l Parks &*

13   *Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001)).  "If the EA establishes that the

14   agency's action 'may have a significant effect upon the environment' then an EIS must be

15   prepared." *Id.*  Otherwise, the agency issues a FONSI.  *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th

16   Cir. 2000).  "'If an agency decides not to prepare an EIS, it must supply a convincing statement of

17   reasons to explain why a project's impacts are insignificant.'" *Id.* (quoting *Blue Mountains*

18   *Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998)).

19   In this case, Plaintiffs allege five violations of NEPA.  The court will address each alleged

20   violation below.

21   **1.  Predetermined Decision Making**

22   WWP argues BLM violated NEPA by predetermining that the EA would not disclose any

23   significant environmental impacts.  In other words, WWP argues the possibility of preparing an

24   EIS was foreclosed during BLM's initial preparations for the Fire Amendment's NEPA analysis.

25   BLM, on the other hand, argues it carefully considered the analysis in the EA and did not foreclose

26

9

1   the possibility that an EIS might be required.  Alternatively, BLM argues any predisposition is

2   irrelevant because the EA itself fully satisfies NEPA.

3        In *Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002), a case involving a highway

4   construction project, the Tenth Circuit found the Defendants had prejudged the NEPA issues.  In

5   that case, a consultant was hired to prepare an EA.  *Id*.  However, the Engineering Services

6   Agreement "stipulated that *a FONSI be signed and distributed by [the Federal Highway*

7   *Administration]*" by a certain date.  *Id*.  The court found the agreement contractually obligated the

8   consultant to prepare a FONSI and have it approved.  *Id*.  Thus, the Tenth Circuit stated, "[t]his

9   prejudgment diminishes the deference owed to the federal defendants in our review of their

10  decision to issue a FONSI rather than an EIS."  *Id*.

11       Similarly, the Ninth Circuit has interpreted NEPA regulations "as requiring agencies to

12  prepare NEPA documents, such as an EA or an EIS, 'before any irreversible and irretrievable

13  commitment of resources.'" *Metcalf*, 214 F.3d at 1143.  *Metcalf* involved a Native-American tribe

14  that wished to resume a 1500-year tradition of hunting whales.  *Id*. at 1137-38.  In that case, the

15  Native-American tribe asked the Federal defendants to help them secure approval to resume

16  hunting whales from the International Whaling Commission in 1995.  *Id*. at 1143.  However, an

17  EA was not prepared until 1997.  *Id*.  During the interim, the United States and the tribe worked

18  toward obtaining permission to hunt a certain quota of whales.  *Id.*  In 1996, the Federal defendants

19  signed a contract with the Native-American tribe to which it committed to support the tribe's

20  whaling proposal.  *Id*.  It was at this point that the Ninth Circuit found the Federal defendants made

21  an irreversible and irretrievable commitment of resources.  *Id*.  Thus, the Ninth Circuit held "that

22  by making such a firm commitment before preparing an EA, the Federal defendants failed to take a

23  'hard look' at the environmental consequences of their actions and, therefore, violated NEPA.  *Id*.

24  at 1145.

25       In contrast to *Davis* and *Metcalf*, the court finds no evidence that BLM predetermined the

26

1   EA would not disclose any significant environmental impacts.  WWP relies on several statements

2   in arguing BLM predetermined the issue.  In 2001, BLM created a document titled Project

3   Management Plan for a Fire Management Amendment to the Elko and Wells Resource

4   Management Plans and Associated Environmental Assessment.  This document contains several

5   sentences that WWP argues demonstrates predetermined decision making.  In describing the

6   "purpose and need," the document indicates an EA "will be completed in order to fulfill

7   obligations under [NEPA] to analyze the potential impacts of the proposed fire management

8   changes on critical elements and resources of the human environment. . . ."  (Admin. Record at

9   1411.)  The document further indicates the BLM Nevada State Director "[a]pproves draft RMP

10   amendment and signs the EA decision record and RMP amendment."  *Id*. at 1421.  Next, the

11   document states, "[a]ll comments will be considered before the final amendment and EA decision

12   record are published."  *Id*. at 1424.  Finally, WWP points to a portion of the document relating to

13   the plan preparation schedule that reads, "[n]otify the public . . . of the approved amendment/EA."

14   (Admin. Record at 1426.)

15   WWP next argues the contract with the consultant for the completion of the Fire

16   Amendment EA contains language limiting its work and fee proposal to the completion of an EA

17   and Decision Record.  *See* (Admin. Record at 1340-47, 4683-85.)  Finally, WWP relies on two

18   statements indicating BLM would prepare an EA.  First, an April, 2001, letter to the BLM State

19   director states, in part, "this office feels that an EA-level environmental analysis is appropriate for

20   the single-issue amendment. . . ."  *Id*. at 1433.  Second, an undated letter written by BLM's

21   Assistant Field Manager for the Elko District states the agency is "proposing to complete an

22   environmental assessment level amendment of the Elko and Wells RMPs."  *Id*. at 4670.

23   The court finds none of these statement sufficient to show Defendants predetermined an EIS

24   would not be necessary.  The evidence provided by WWP demonstrates Defendants determined the

25   completion of an EA was appropriate.  However, as WWP correctly concedes,  the preparation of

26

11

1   an EIS is only necessary if the EA establishes that the agency's action may have a significant effect

2   upon the environment.  (Mot. for Partial Summ. J. (# 44) at 12-13); *High Sierra Hikers Ass'n*, 390

3   F.3d at 639.  Here, none of the evidence relied upon by WWP shows that Defendants determined

4   there would be no significant impact prior to preparing the EA.  Rather, the evidence simply shows

5   that Defendants would complete an EA.

6         The documents relied upon by WWP do not explicitly indicate an EIS would be prepared in

7   the event the EA showed the amendment may have a significant effect upon the environment.

8   Nevertheless, an EA serves, in part, to "[b]riefly provide sufficient evidence and analysis for

9   determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9(a)(1).  An agency's

10  decisions are entitled to a presumption of regularity.  *Natural Resources Defense council, Inc. v.*

11  *Winter*, 518 F.3d 658, 688 (9th Cir. 2008) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*,

12  401 U.S. 402, 415 (1971)).  "In the absence of clear evidence to the contrary, the doctrine presumes

13  that public officers have properly discharged their official duties." *Butler v. Principi*, 344 F.3d

14  1337, 1340 (Fed. Cir. 2001) (citing *United States v. Chemical Found. Inc.*, 272 U.S. 1 (1926)).  In

15  this case, there is no evidence that Defendants predetermined the issue or that Defendants would

16  not complete an EIS in the even the EA demonstrated there may be a significant effect upon the

17  environment.

18         **2.  The Affected Environment**

19         NEPA regulations require a federal agency to analyze the affected environment.  40 C.F.R.

20  § 1502.15.  With respect to an EIS, the regulations require the document to "succinctly describe the

21  environment of the area(s) to be affected or created by the alternatives under consideration.  The

22  descriptions shall be no longer than is necessary to understand the effects of the alternatives." *Id.*

23  In analyzing the affected environment, NEPA requires the agency to set forth the baseline

24  conditions.  *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir.

25  1998).  Without establishing the baseline conditions, there is no way to determine what effect the

26

1    proposed action will have on the environment and, consequently, no way to comply with NEPA.

2    *Id*.

3        Chapter 3 of the EA analyzes the affected environment.  WWP challenges several portions

4    of this analysis.  Specifically, WWP argues the EA fails to analyze the baseline conditions of two

5    scenic rivers, the wildlife, soil, wetland and riparian zones, and vegetation.  Defendants argue the

6    EA sufficiently analyzes the affected environment.  Upon carefully examining the EA, the relevant

7    law and the parties' points and authorities, the court finds the EA sufficiently analyzes the baseline

8    condition of the affected environment.

9        WWP first challenges the EA's analysis of wild and scenic rivers.  The EA notes there are

10   two rivers with Wild and Scenic River status in the Elko District.  (Admin. Record at 580.)  The

11   EA further indicates how many miles of the rivers are designated as wild and scenic.  The court

12   finds this description sufficient for purposes of an EA.  Pursuant to the regulations, the EA need

13   only "succinctly describe the environment."  40 C.F.R. § 1502.15.

14       WWP next challenges the EA's discussion of wildlife.  The EA indicates there are

15   approximately 70 species of mammals, 273 species of birds, and 28 species of reptiles and

16   amphibians located in the area.  (Admin. Record at 582.)  The EA states, "[s]everal locally

17   representative species of wildlife are used to illustrate the affected environment in relation to an

18   integrated approach to fire management."  *Id*.  The representative species identified are the

19   pronghorn, elk, mule deer, Great Basin pocket mouse and red tail hawk.  *Id*.  WWP has provided

20   no evidence indicating the species addressed in the EA are not representative of the wildlife in the

21   Elko District or that the species addressed fail to establish a proper baseline of the current

22   conditions.

23       The EA also addresses how fire can improve the habitat of these representative species.  *Id*.

24   at 582-84.  In addition, the EA identifies how fire history and past fire management practices have

25   influenced the current condition of mule deer habitat and other big game species.  *Id.* at 583.  The

26

13

1   EA further notes that significant acres of sagebrush habitat important for sage grouse and other

2   sagebrush obligates have been lost to wildfire.  (Admin. Record at 584.)

3       WWP argues that the Fire Amendment is devoid of any analysis of the current conditions of

4   the sage grouse.  The court disagrees.  The EA notes that there are 55 state and federal special

5   status plants and animals likely to occur on public lands in the Elko district.  *Id*. at 585.  One of the

6   species addressed is the sage grouse.  *Id*. at 582, 585. The EA indicates that sage grouse have been

7   affected by fire over the past two decades.  *Id*. at 585.  The effect on sage grouse can be either

8   positive or negative depending on the pre-fire habitat quality and the type of fire.  *Id*.  The EA

9   further identifies objectives that should be met with an integrated fire management approach.  *Id*.

10      WWP identifies the pygmy rabbit as a species of concern that was omitted from the Fire

11  Amendment EA.  WWP is correct that the pygmy rabbit is a species of concern that may appear in

12  the Elko District.  *Id*. at 724.  In May, 2003, the Nevada BLM State Director indicated there was a

13  growing concern for the pygmy rabbit throughout the West because of their apparent declines.  *Id*.

14  at 5096.  A table titled Predicted Species Response to Proposed Vegetation Treatments in

15  Sagebrush-Grassland Ecotypes indicates it is unknown whether the pygmy rabbit is present within

16  the project area.  *Id*. at 726.

17      Although WWP is correct that the EA does not specifically analyze the pygmy rabbit, the

18  court finds such an omission does not violate NEPA.  The EA specifically identifies the sage

19  grouse as the representative sensitive species in the Elko District.  (Admin. Record at 582.)  There

20  is no indication in the record that the use of a representative species is insufficient to properly

21  analyze the affected environment.  To conclude otherwise would lead to a situation where BLM

22  was forced to analyze each individual species within the approximately 70 species of mammals,

23  273 species of birds, and 28 species of reptiles and amphibians.  However, an EA need only

24  "succinctly describe the environment."  40 C.F.R. § 1502.15.  Furthermore, this court's role is to

25  determine whether the EA contains "'a reasonably thorough discussion of the significant aspects of

26

1    the probable environmental consequences.'" *Swanson v. U.S. Forest Service*, 87F.3d 339, 343 (9th

2    Cir. 1996).  Here, the court finds that the EA complies with NEPA.

3         WWP next argues no environmental baseline is provided for fossorial mammals, the red-

4    tailed hawk and reptiles and amphibians.  According to the EA, fire has little direct effect on

5    fossorial mammals in their burrows.  (Admin. Record at 584.)  The EA describes how the red-

6    tailed hawk can be negatively affected by fire if fire burns nest trees that are occupied.  *Id*.  With

7    respect to reptiles and amphibians, the EA notes many of these creatures live in mesic habitats,

8    which are likely to burn less often and less severely than upland sites.  *Id.*  The court finds these

9    descriptions sufficient for purposes of NEPA.

10        Finally, WWP challenges the EA's analysis of soils, wetlands and riparian zones, and

11   vegetation.  Nevertheless, the court finds the EA adequately addresses the baseline condition of

12   these resources.  First, the EA indicates soils in the Elko District were mapped by the Natural

13   Resource Conservation Service as part of eight different soil surveys.  *Id*. at 586.  The EA

14   continues by describing soils occurring in various locations.  *Id.* at 586-88.  For example, the EA

15   notes that soils occurring in floodplains are deep, have a high organic matter content and may be

16   poorly drained.  *Id*. at 486.  Similar descriptions are provided for soils occurring on bolson and

17   semi-bolson floors at lower elevations, soils occurring on terraces and piedmont slops, soils

18   occurring on mountains and hills, and soils in the Owyhee Desert.  *Id*. at 586-87.  This description

19   complies with NEPA.

20        The EA also describes wetland and riparian zones.  There are approximately 30,000 acres of

21   wetlands and riparian zones within the Elko District.  *Id*. at 588.  The EA notes these zones are "at

22   times inundated by water, and normally have saturated or seasonably saturated soil conditions

23   within 10 feet of surface water."  *Id*.  The width of these areas vary from a few feet to several

24   hundred feet.  *Id*.  The wetlands and riparian areas are the most vegetatively diverse communities

25   within the Elko District.  *Id*. at 589.  The EA identifies vegetation species that occur in the area and

26

15

1   how several species respond to fire.  *Id*.  The court finds this description sufficient to comply with

2   NEPA.

3           Finally, the court finds the EA suffiently analyzes the baseline conditions of the affected

4   vegetative communities.  The EA's analysis is divided into categories describing annual grassland

5   communities, perennial grassland communities, sagebrush communities, pinyon-juniper, mixed

6   conifer, mountain brush, and crested wheatgrass seedlings.  (Admin. Record at 590-97.)  The court

7   finds each of these sections adequately identifies the baseline conditions.  *See id.*  The EA

8   describes the vegetation, indicates the amount of acres composed of the various categories and

9   discusses how fire affects these resources.  *Id*.

10          For the foregoing reasons, the EA appropriate addresses the affected environment along

11  with its baseline conditions.

12                          **3.  NEPA's Hard Look Requirement**

13          WWP contends the Fire Amendment EA does not comply with NEPA's "hard look"

14  mandate because the analysis and conclusions are devoid of scientific rationale and supporting

15  data, the EA does not discuss opposing views or information, and the EA does not analyze

16  cumulative impacts.  Defendants argue the EA discloses both beneficial and adverse impacts.

17  Defendants further argue that many conclusions in the EA are amply supported by scientific data

18  and studies in a 1991 EIS for Vegetation Treatment in 13 Western States.  Finally, Defendants

19  contend that cumulative impacts were analyzed as part of the baseline of the affected environment.

20  The court will address each alleged NEPA violation individually below.

21                      **a.  Scientific Data and Opposing Views**

22          Plaintiffs contend the Fire Amendment EA's conclusion that the Fire Amendment will have

23  only beneficial impacts is not supported by scientific references or data.  An agency cannot avoid

24  preparing an EIS by making conclusory assertions that an activity will have only an insignificant

25  impact on the environment.  *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 864

26

                                                    16

(9th Cir. 2005) (citing *Alaska Ctr. for Env't v.United States Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999)).  "Under NEPA, '[a]gencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements.  They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement.'" *Earth Island Inst. v. U.S. Forest Service*, 442 F.3d 1147, 1159-60 (9th Cir. 2006) (quoting 40 C.F.R. § 1502.24).

NEPA requires an agency to candidly disclose the risks of its proposed action and to respond to adverse opinions held by respected scientists.  *Seattle Audubon Soc'y v. Moseley*, 798 F.Supp. 1473, 1482 (W.D. Wash. 1992) (citing *Friends of the Earth v. Hall*, 693 F.Supp. 904, 934, 937 (W.D. Wash. 1988)).  "The agency may not rely on conclusory statements unsupported by data, authorities, or explanatory information."  *Id.* (citing *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973)).  An agency has acted arbitrarily and capriciously when it fails to make a reasoned decision based on an evaluation of the evidence.  *Earth Island Inst.*, 442 F.3d at 1160.

Here, WWP does not identify any specific portion of the EA that is not supported by scientific research.  Rather, WWP broadly argues "the Fire Amendment EA's claims that its 'integrated approach to fire management' will have only beneficial impacts to all of the resources is not supported by scientific research."  (Mot. for Partial Summ. J. (# 44) at 20.)  To support this contention, WWP identifies to two broad portions of the EA located within the Environmental Consequences chapter.  *See* (Admin. Record at 613-15, 621-36.)

Although WWP is correct that some portions of the EA are not supported by references, the court finds the EA, as a whole, adequately references the data it relies on.  As pointed out by Defendants, many conclusions in the EA are supported by scientific data and studies in the 1991 EIS for Vegetation Treatment in 13 Western States.  *See* (Admin. Record at 2316-2968.)  Moreover, the EA includes a lengthy list of references.  *Id.* at 653-59.  Thus, the court finds the EA meets the minimum requirement necessary.  However, to avoid possible violations in the future,

17

Defendant should carefully refer to the requirements of 40 C.F.R. § 1502.24 and make explicit

reference to the scientific and other sources relied upon for conclusions in the environmental

document.

WWP next argues BLM failed to disclose potential negative impacts and opposing views in

the Fire Amendment EA.  To support its position, WWP primarily relies on a nine-year study on

the Response of a Sage Grouse Breeding Population to Fire in Southeastern Idaho, an October,

2000, document entitled Management Guidelines for Sage Grouse and Sagebrush Ecosystems in

Nevada ("Management Guidelines"), and the Declaration of Fite.

All three documents indicate that sage grouse habitat can be adversely affected by

prescribed burning.  (Admin. Record at 1597-1637, 9066-72; Mot. for Partial Summ. J. (# 44);

Decl. of Fite ¶¶ 33-37.)  Upon carefully reviewing the Fire Amendment EA, the court finds that the

EA adequately address the concerns raised regarding possible adverse affects on sage grouse

habitat.

In addressing alternative actions, the EA contains a section describing actions common to

all alternatives.  (Admin. Record at 529-30.)  One action that is common to all alternatives is to

"[f]ollow the guidance in the Management Guidelines for Sage Grouse and Sagebrush Ecosystems

in Nevada." *Id*. at 530.  The Management Guidelines set forth eleven recommendations that are

explicitly recognized by the EA, including consideration of "the habitat needs of sage grouse when

planning vegetation treatments and maintenance projects."  *Id*. at 718-19.  The guidelines further

direct BLM to "[u]se vegetation treatments to maintain or improve known habitats" and to "[a]void

vegetation treatments in known habitats where birds are present."  *Id*. at 719.

The EA further notes that sage grouse can be either positively or negatively effected by fire.

*Id*. at 585.  The EA continues by describing conditions in sagebrush that benefit sage grouse.  *Id*.

For example, "[f]ire that creates a mosaic of different age class and structure of sagebrush benefits

sage grouse."  *Id.*  Further, "[a] fire within a sage grouse area can be beneficial if it does not burn

18

key winter habitat or large tracts of land." *Id*.  With regard to concern over cheatgrass, the EA states, "[e]fforts to prevent cheatgrass invasion following fires would be essential to sage grouse habitat rehabilitation."  *Id*.  Finally, the EA indicates the management of sage grouse habitat will also preserve other sensitive sagebrush species.  *Id*.

Thus, the EA does recognize that fire can adversely affect sage grouse habitat.  However, the EA concludes that certain fire activity will actually be beneficial to sage grouse habitat under certain conditions.  For these reasons, the court finds no violation of NEPA.

### b. Cumulative Impacts

"If several actions have a cumulative environmental effect, 'this consequence must be considered in an EIS.'" *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (quoting *Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1378 (9th Cir. 1998)).  A cumulative impact

> is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  "A proper consideration of the cumulative impacts of a project requires some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d 989, 993 (9th Cir. 2004) (internal quotations omitted) (citing *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1128 (9th Cir. 2004)).

WWP argues the cumulative impacts analysis is deficient.  Specifically, WWP argues the cumulative impacts analysis for the proposed action fails to address the cumulative impacts of past fires, past and ongoing vegetation eradication treatments and rehabilitation projects, and livestock grazing.  Defendants also seek summary judgment.  Defendants first argue WWP failed

19

1   to properly raise its concern regarding the cumulative impacts from past fires along with past and

2   ongoing vegetation eradication treatments and rehabilitation projects.  Additionally, Defendants

3   argue the EA adequately considered the cumulative impacts of the Fire Amendment.

4        The court will first address whether WWP waived its arguments concerning whether the EA

5   failed to address impacts from past fires along with past and present ongoing treatments.  "Persons

6   challenging an agency's compliance with NEPA must 'structure their participation so that it . . .

7   alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the

8   issue meaningful consideration."  *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004).

9   Absent exceptional circumstances, belatedly raised issues may not form a basis for reversal of an

10  agency decision.  *Havasupai Trive v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991) (citing *Vermont*

11  *Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553-54 (1978)).

12       WWP contends it previously raised its concerns in its protest of the Fire Amendment EA

13  and in its comments on the draft EA.  In WWP's protest of the Fire Amendment EA, WWP states,

14  "BLM failed to compile data on all past prescribed and wild fire, strip spraying, chaining, wood

15  cutting, land-based chemical application, and other methods of chemical treatment in its EA

16  analysis."  (Admin. Record at 8434.)  In its comments on the draft EA, WWP states, "we ask that

17  you provide maps that show the current extent of past manipulation/seedings/treatments over the

18  potential habitat of the species.  This is necessary to understand how much pinyon-juniper and

19  other communities have already been altered."  *Id*. at 697.  The court finds these statements

20  sufficient to put Defendants on notice of WWP's concerns so that BLM could give the issues

21  meaningful consideration.  Thus, the court will analyze the merits of WWP's contentions.

22       WWP argues that "none of the cumulative impacts analyses for any of the resources actually

23  analyze the cumulative impacts that past wildfires, past and ongoing fire prevention and fire

24  rehabilitation measures, or other management practices will have when combined with the fire

25  suppression, prevention, response and rehabilitation measures of the Fire Amendment."  (Mot. for

26

20

Partial Summ. J. (# 44) at 23.)  Defendants, on the hand, contend that past fire forms part of the baseline of the affected environment.  Defendants further argue that past fire management practices, as well as various rehabilitation efforts, were analyzed under a former EIS and were utilized before the Fire Amendment.

The court finds the EA sufficiently analyzes the cumulative impacts of past fires along with past and ongoing vegetation eradication treatments and rehabilitation projects in the EA as part of the baseline conditions.  In discussing the affected environment, the EA notes that "[m]any of the plant communities evolved under a regime of intermittent fire and are adapted in some way to fire."  (Admin. Record at 574.)  The EA further notes that "fire is a natural part of the ecosystem of the area."  *Id*. at 574, 600.  The ecosystems have some natural adaptation to the effects of fire since wildfire historically is a natural occurrence.  *Id*. at 575.  The EA further indicates that "fire history and past fire management practices has influenced the current condition of mule deer habitat and other big game species."  *Id*. at 583.  In addition to noting what affect past fire management practices have had on big game species, the EA states that the past emphasis on suppressing fires has altered natural fire cycles.  *Id*. at 600.  Due in part to the extent that the native landscape has been altered, the EA indicates the return of natural fire cycles cannot be expected.  *Id*.

Thus, although the cumulative impacts analysis does not explicitly address past fires or past vegetation treatments and rehabilitation projects, the EA does consider these issues in discussing the affected environment and the environmental consequences of the amendment.  As a result, the EA complies with NEPA by addressing the cumulative impacts from past fires along with past and present ongoing treatments.

With respect to livestock grazing, WWP argues the cumulative impacts analysis for BLM's proposed action does not address past, ongoing and future livestock grazing throughout the Elko District.  Defendants contend the EA sufficiently analyzes cumulative impacts because the document examined environmental impacts based on existing conditions of the land and on an

21

assumption that land ownership and land use patterns would remain relatively constant.

The court agrees with Defendants that the EA sufficiently analyzes the cumulative impacts of the fire amendment in conjunction with the impacts of past, present, and future livestock grazing in the Elko District. The EA examined the environmental consequences of the proposed action with the assumption that land ownership and land use patterns will remain relatively constant. (Admin. Record at 600.) The EA further identifies livestock grazing as a primary use of BLM lands in the area. *Id*. at 598. BLM achieves desired objectives for livestock grazing management through allotment evaluation and a multiple use decision process and prescribes the manner and extent to which livestock grazing is conducted and managed to meet its goals and objectives. *Id*. Thus, the EA's analysis of environmental consequences considered past, present, and future livestock grazing in the Elko District. For this reason, the court finds the EA sufficiently analyzes the cumulative impacts of the action when added to other past, present, and reasonably foreseeable future actions.

**4. Tiering to Other Documents**

NEPA permits agencies to "tier" their EISs to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review. 40 C.F.R. § 1502.20. "Tiering refers to the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analyses . . . incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1502.28. An agency is not permitted to tier to a document that has not been subject to NEPA review. *Oregon Natural Res. Council v. U.S. Bureau of Land Mgmt.*, 470 F.3d 818, 823 (9th Cir. 2006) (citing *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgt.*, 387 F.3d 989, 998 (9th Cir. 2004)).

WWP argues the EA violates NEPA by tiering to non-NEPA documents. Defendants, on the other hand, argue the EA does not tier to any non-NEPA documents. Rather, the EA indicates

it was "guided by" one or more prior agency publications.

The EA analyzes alternatives based on four components: general fire management, fire prevention, fire suppression, and fire rehabilitation. (Admin. Record at 528.) The fire prevention component is guided by the 1998 Elko District Field Office Fire Management Plan and the Elko/Wells District Vegetation Treatment by Fire Environmental Assessment. *Id*. The fire rehabilitation component is guided by the 2001 Interagency Burned Area Emergency Stabilization and Rehabilitation Handbook and a 2000 Normal Fire Rehabilitation Plan Environmental Assessment. *Id*. The EA indicates that only general information addressing the whole District is provided since most elements outlined in the EA are addressed in other documents. (Admin. Record at 528.)

As mentioned, "tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA." *Kern v. United States Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002). Thus, to the extent Defendants "tiered" to non-NEPA documents, they cannot be considered to determine whether the analysis is sufficient. *Id.* Rather, the adequacy of the EA depends on the analysis contained in the document itself. *Id*. Thus, although WWP is correct that NEPA does not permit tiering to non-NEPA documents, WWP has not pointed out any specific portion of the EA that is insufficient on its own. *See* (Mot. for Partial Summ. J. (# 44) at 27-28.) And, as identified in the preceding paragraph, the EA also relies on NEPA documents along with non-NEPA documents. *See* (Admin. Record at 528.) Thus, the court finds WWP has failed to meet its burden of showing the EA is insufficient due to improper reliance on non-NEPA documents.

### 5. Failure to Prepare an EIS

WWP argues that Defendants were required to prepare an EIS. Specifically, WWP asserts the Fire Amendment EA demonstrates that there may be significant impacts to the unique resources of the area. WWP further asserts the records shows the existence of substantial controversy over

23

the impacts of the Fire Amendment's vegetation treatment and rehabilitation measures.  Finally, WWP argues the EA's lack of baseline conditions and unsupported conclusions regarding cumulative impacts of livestock grazing raise substantial questions about the project's effects on the environment.  Defendants argue BLM's decision not to prepare an EIS was reasonable and entitled to deference.

As previously discussed, a federal agency must prepare an EIS for all "proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Pursuant to NEPA regulations, the term "[s]ignificantly . . . requires considerations of both context and intensity."  40 C.F.R. § 1508.27.  "Context simply delimits the scope of the agency's actions, including the interests affected."  *Nat'l parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001); 40 C.F.R. § 1508.27(a).  Intensity "refers to the severity of the impact."  40 C.F.R. § 1508.27(b).  In evaluating intensity, the regulations identify ten factors.  *Id*.  WWP challenge's the EA in regard to three of these factors including the unique characteristics of the geographic area, 40 C.F.R. § 1508.27(b)(3), the degree to which the effects on the quality of the human environment are likely to be highly controversial, 40 C.F.R. § 1508.27(b)(4), and the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, 40 C.F.R. § 1508.27(b)(5).  The court will address each factor individually.

### a.  Unique Characteristics of the Geographic Area

In considering intensity, the EA should address the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas."  40 C.F.R. § 1508.27(b)(3).  WWP argues the EA ignores many of the Elko District's unique areas.  WWP specifically alleges defects in the EA's alleged failure to discuss two Wild and Scenic rivers along with wetlands in the Elko District.  Defendants argue that each of the unique characteristics of the geographic area are

24

1    addressed in the Affected Environment section of the EA.  The court agrees with Defendants.

2        BLM's FONSI states the proposed action has "no potential to affect characteristics of the

3    only designated 'area of critical environmental concern' (ACEC) in the planning area, the Salt

4    Lake ACEC.  The proposed plan incorporates applicable procedures for the protection and

5    management of historic and cultural resources and other ecologically critical areas in the planning

6    area." (Admin. Record at 514.)  This conclusion is adequately supported by the EA.

7        As previously addressed, the EA's Affected Environment section identifies the two rivers

8    with Wild and Scenic River status in the Elko District and the mileage of the rivers that are

9    designated as wild and scenic.  *Id*. at 580.  In analyzing the Environmental Consequences of the

10   proposed action, the EA states, "[i]f appropriate grazing management systems are not in place,

11   natural fire may impact riparian areas, putting these systems at risk for increased losses of

12   vegetation, accelerated rates of erosion and increased sediment loading." *Id*. at 614.  However, the

13   EA further identifies that BLM achieves desired objectives for livestock grazing by prescribing the

14   manner and extent to which livestock grazing is conducted and managed to meet multiple use,

15   sustained yield, economic and other goals and objectives." (Admin. Record at 598.)

16       Similarly, the EA's Affected Environment section analyzes wetlands and riparian zones

17   within the Elko District.  *Id*. at 588.  In analyzing the Environmental consequences of the proposed

18   action, the EA indicates the overall effect of the proposed action on wetlands and riparian areas, as

19   well as the upland habitats that surround them, is expected to generally benefit these resources.  *Id*.

20   at 632. The EA further notes, however, "depending on fire intensity and pre-fire conditions,

21   anticipated residual impacts would include severe erosion, sedimentation, down cutting of the

22   stream channel and lower the water table.  These impacts degrade the health of the riparian

23   system." *Id*.  Despite possible residual effects, the EA concluded an EIS is not necessary.  No basis

24   has been provided to overcome the deference due to this conclusion.  *Akiak Native Cmty*, 213 F.3d

25   at 1146.  Thus, the court finds the EA adequately considers the unique characteristics of the

26

25

geographic area.

### b. Controversial Effects

40 C.F.R. § 1508.27(b)(4) directs the agency to consider the "degree to which the effects on the quality of the human environment are likely to be highly controversial." "The term 'controversial' refers 'to cases where substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to use.'" *Found. for N. Am. Wild Sheep v. United States Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir. 1982) (quoting *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir. 1973)). "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI casts serious doubt upon the reasonableness of an agency's conclusions." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736 (citations omitted).

WWP argues the record shows the existence of substantial controversy over the impacts of the Fire Amendment's vegetation treatment and rehabilitation measures. Defendants, on the other hand, argue the disagreement pointed out by WWP does not amount to a "highly controversial" effect.

In support of its arguments, WWP relies on a March, 2001, Project Management Plan. In identifying fire management issues for the Elko District, the document indicates there is an increased demand for the protection of sagebrush habitat throughout the District. (Admin. Record at 1316.) The document then notes, "[w]hether this protection includes suppressing fires in this habitat is controversial." *Id.* at 1316. The Project Management Plan also notes that some livestock managers prefer that rehabilitation efforts use native species while others feel the use of nonnative species are the only effective competitors against cheatgrass after wildfire in some areas. *Id.*

BLM's FONSI states, "[t]he effects of wildland fire and burned area rehabilitation and hazardous fuels reduction projects, to include mechanical, chemical, biological and prescribed fire treatments are well known and documented." (Admin. Record at 514.) The FONSI continues, "[t]o the degree such treatments are proposed to reduce adverse impacts and meet resource

26

management objectives, effects not likely to be highly controversial." *Id*.  Although WWP has pointed out some controversy regarding suppression of fires and whether to use native or nonnative species with respect to rehabilitation, WWP has not identified how this controversy relates to the "degree such treatments are proposed to reduce adverse impacts and meet resource management objectives." In other words, WWP has not identified why this controversy would require an EIS. The FONSI does not indicate there is no controversy surrounding these issues.  Rather, it states the effects are not controversial to the degree used in the Fire Amendment. *Id*. at 514.  Thus, the court finds WWP failed to meet its burden of showing that Defendants were required to prepare an EIS.

### c. Uncertainty

In evaluating intensity, the environmental document should consider "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5).  "An agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731 (citing *Blue Mountains Biodiversity Project*, 161 F.3d at 1213).  "Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent 'speculation on potential . . . effects.'" *Id*. at 732 (citations omitted).  An EIS is not required anytime there is some uncertainty; rather, the effects of the project must be highly uncertain. *Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1011 (9th Cir. 2006) (citing *Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005)).

In this case, WWP argues the EA's lack of baseline conditions and its unsupported conclusions regarding the cumulative impacts of livestock grazing and the integrated approach to fire management raise substantial questions about the project's effects on the environment. Defendants argue the EA demonstrates that procedures are in place to prevent undue environmental harm and risk.

In support of its argument, WWP first points to a portion of the EA indicating that "[a] determination of the environmental consequences is difficult because fire is a natural part of the ecosystem.  Accurate projections of number of acres impacted by wildfire or related activities within the District's 7.5 million acres of public land are also difficult due to the number of variables present."  (Mot. for Partial Summ. J. (# 44) at 35); (Admin. Record at 600.)  Although the EA indicates there are difficulties in determining environmental consequences and making accurate projections of the number of acres impacted, these statements do not show the effects of the project are highly uncertain.  Rather, the statements outline the difficulties in evaluating the environmental consequences.  (Admin. Record at 600).

WWP next argues that livestock grazing is highly uncertain.  According to WWP, "because BLM provided no baseline conditions for these resources, nor any data or references from allotment evaluations, the extent to which such strategies are being implemented, and whether they are successful, is highly uncertain."  (Mot. for Partial Summ. J. (# 44) at 35.)  As previously discussed above, the EA adequately considered the environmental impacts of livestock grazing.  WWP has not provided any evidence indicating the effects of livestock grazing are highly uncertain.  Thus, the court finds WWP has failed to meet its burden of showing the impacts of the Fire Amendment are highly uncertain with respect to livestock grazing.  Furthermore, as previously addressed, the EA adequately sets forth the baseline conditions of other resources.

**C.  The Endangered Species Act**

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1978).

Section 7 of the ESA provides, "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).  If any listed or proposed listed species may be present in the area of the proposed action, the agency may "conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action."  16 U.S.C. § 1536(c).  A biological assessment is required for Federal actions that are considered "major construction activities."  50 C.F.R. § 402.12(b).

"If the agency concludes that its proposed action may affect listed species of critical habitat, it must initiate consultation with the [Fish and Wildlife Service ("FWS")] or the National Fisheries Service."  *Oregon Natural Res. Council v. Allen*, 476 F.3d 1031, 1033 (9th Cir. 2007) (citing 50 C.F.R. § 402.14).  Formal consultation is not required if the Federal agency determines that the proposed action is not likely to adversely affect any listed species or critical habitat.  50 C.F.R. § 402.14(B)(1).  Once formal consultation is initiated, FWS is required to "[f]ormulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. § 402.14(g)(4).  Formal consultation is terminated if the Federal agency determines that the proposed action is not likely to adversely affect any listed species or critical habitat.  50 C.F.R. § 402.14(l)(3).

In this case, Defendants seek summary judgment on WWP's ESA claims.  Defendants initially argue summary judgment is appropriate because WWP has failed to prosecute its ESA claims.  Defendants next argue that WWP's claims regarding the bald eagle are moot.  Third, Defendants argue the programmatic biological opinion was reasonable and valid.  Finally, Defendants argue that WWP has failed to identify any deficiency with the biological assessment.

29

1    The court will address each argument separately below.

2        **1.  Failure to Prosecute**

3        Defendants argue WWP abandoned its ESA claims by failing to raise them in its motion for

4    summary judgment.  WWP opposes summary judgment arguing it did not abandon its claims.

5    Rather, WWP argue it filed a partial motion for summary judgment reserving the right to prosecute

6    its ESA claims at a later time.  According to WWP, it determined to bifurcate its claims due to the

7    massive administrative record and the numerous issues involved in this case.

8        In the interest of justice, the court finds WWP did not abandon its ESA causes of action.

9    WWP's motions explicitly indicates it is only seeking partial summary judgment.  Morever, WWP

10   has addressed its ESA cause of action in opposition to Defendant's motion.  Thus, the court will

11   consider WWP's ESA arguments as they have been fully briefed and submitted.

12       **2.  The Bald Eagle**

13       WWP's second cause of action alleges Defendants violated ESA with respect to their

14   consultation of the Fire Amendments impacts on the bald eagle.  Defendants argue WWPs claims

15   regarding the bald eagle are moot because the bald eagle is no longer a listed species under ESA.

16   WWP has not opposed Defendants' arguments regarding the bald eagle.

17       The court finds Defendants have met their initial burden of showing there are no genuine

18   issues of material fact.  The rules and regulations for FWS indicate the bald eagle was removed

19   from the list of endangered and threatened wildlife.  72 Fed. Reg. 37346 (July 9, 2007)

20   ("The best scientific and commercial data indicate that the bald eagle has recovered.  Therefore,

21   under the authority of the [ESA], we, the [FWS], remove (delist) the bald eagle. . . in the lower 48

22   states of the United States from the Federal List of Endangered and Threatened Wildlife."); 50

23   C.F.R. § 17.11(h).  Because the bald eagle was removed from the list of endangered and threatened

24   wildlife, Defendants had no obligation to this species under the ESA.  16 U.S.C. §§ 1531-1544.

25   Thus, summary judgment will be granted in favor of Defendants on any claim regarding ESA

26

1    violations on account of the bald eagle.

2            **3.  Incidental Take Statement**

3            WWP's second cause of action alleges, among other things, that Defendants violated the

4    ESA by failing to provide an Incidental Take Statement ("ITS").  (Compl. (# 1) ¶ 86(f).)

5    Defendants seek summary judgment arguing an ITS was not required because the biological

6    opinion was a programmatic opinion for an action or program that would not result in a take.

7    WWP disagrees and argues that ESA specifically requires Defendants to issue an ITS with its

8    biological opinion.

9            Section 9 of the ESA prohibits any person subject to the jurisdiction of the United States to

10   "take" any endangered or threatened species.  16 U.S.C. § 1538(a)(1)(C).  "The term 'take' means

11   to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in

12   any such conduct."  16 U.S.C. § 1532(19).  As part of the formal consultation process, FWS must

13   specify whether any "incidental taking" of a protected species will occur.  16 U.S.C. § 1536(b)(4);

14   *Arizona Cattle Growers' Ass'n v. United States Fish & Wildlife*, 273 F.3d 1229, 1239 (9th Cir.

15   2001) (citations omitted).  An "incidental taking" is "any taking otherwise prohibited, if such

16   taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  50

17   C.F.R. § 17.3.  An ITS is developed if there is a determination that an incidental taking will occur.

18   *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1239.  The ITS "functions as a safe harbor provision

19   immunizing persons from Section 9 liability and penalties for takings committed during activities

20   that are otherwise lawful and in compliance with its terms and conditions."  *Id*. (citing 16 U.S.C. §

21   1536(o)).

22           In this case, BLM determined its fire management programs had the potential to affect

23   species protected by ESA.  (Admin. Record at 648.)  As a result, BLM consulted with FWS.  A

24   biological assessment was prepared and it concluded the proposed action may affect several

25   species, but that the proposed action is not likely to adversely affect any of those species.  *Id*. at

26
                                                    31

649.

On December 5, 2003, FWS issued its biological opinion for the Fire Amendment. *Id*. at 6384-89. The biological opinion determined the proposed action would not jeopardize the continued existence of the species at issue. *Id*. at 6389. However, the biological opinion further found that "[a]dverse effects are expected under the proposed action, primarily through fire suppression activities, burned area rehabilitation and stabilization treatments, and fuels treatments." *Id*. The biological opinion indicates FWS would not issue an ITS. *Id*. The biological opinion explains as follows:

> [T]he proposed action, by itself, is one of multiple steps in the FMP. The likelihood of incidental take, and the identification of reasonable and prudent measures and terms and conditions to minimize such take, will be addressed in project level, and possible programmatic level consultations. Any incidental take and measures to reduce such take cannot be effectively identified at the level of proposed action because of uncertainty of wildland fire, broad geographic scope, and the lack of site specific information. Rather, incidental take and reasonable and prudent measures may be identified adequately through subsequent actions subject to section 7 consultations at the project and/or programmatic scale.

(Admin. Record. at 6389.)

Defendants rely on *Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004), for the proposition that an ITS is not required because the Ninth Circuit has endorsed programmatic environmental analysis and planning under the ESA. *Gifford Pinchot Task Force* involved a challenge to six biological opinions issued by FWS pursuant to ESA. *Id*. at 1062-63. Prior to issuing the six biological opinions at issue, the federal government had adopted a comprehensive management plan for the area. *Id*. at 1063. The biological opinion for the comprehensive plan did not authorize incidental takes and deferred such consideration to future biological opinions that would address specific projects. *Id*. at 1064. The subsequent biological opinions issued by FWS implemented the methods developed by the comprehensive plan. *Id*. at 1067. In determining whether the six biological opinions at issue violated ESA, the court stated, "[w]e have previously approved programmatic environmental analysis supplemented by later

project-specific environmental analysis." *Id*. at 1068.  However, the court noted that the comprehensive plan at issue in that case was "a unique land-management plan" that had already been approved and the court was hesitant to fault the agency for relying on the plan.  *Id*.

WWP is correct that *Gifford Pinchot Task Force* does not indicate an ITS is not required for a programmatic biological opinion.  Although the comprehensive forest management plan at issue in that case deferred consideration of incidental takes and ultimately survived litigation, there is no indication the court ever considered any challenge to the plans failure to issue an ITS. Nevertheless, *Gifford Pinchot Task Force* does suggest that such an approach may be appropriate.

In the context of this case, the court finds no error in the failure of FSA to issue an ITS. Similar to *Gifford Pinchot Task Force*, the biological opinion in this case does not contemplate actual action.  Because no action is taking place at this time, no "take" is occurring.  The biological opinion explicitly states "[t]he likelihood of incidental take, and the identification of reasonable and prudent measures and terms and conditions to minimize such take, will be addressed in project level, and possible programmatic level consultations."  (Admin. Record at 6389.)  Thus, FSA will issue an ITS, if necessary, at the time a specific project is authorized.  The court finds this approach reasonable in the context of this case.  The biological opinion notes, "[a]ny incidental take and measures to reduce such take cannot be effectively identified at the level of proposed action because of uncertainty of wildland fire, broad geographic scope, and the lack of site specific information."  (Admin. Record at 6389.)  The court defers to the agency's informed decision that an ITS is not appropriate at this time due its inability to identify any incidental take.  *See Ranchers Cattleman Action Legal Fund v. United States Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005) (citing *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1236.)  Thus, as there is no evidence an incidental taking will occur as a result of the Fire Amendment itself, summary judgment will be granted in favor of Defendants.

///

1

### 4.  The Biological Assessment

2       WWP's second cause of action alleges the biological assessment failed to evaluate the

3   potential effects of the action and failed to provide the best scientific and commercial data

4   available.  (Compl. (# 1) ¶¶ 86(a)-(b).)  Defendants argue they were under no obligation to prepare

5   a biological assessment in this case because this is not a major construction activity.  Defendants

6   further argue WWP has failed to identify any flaw in the biological assessment.  Finally,

7   Defendants argue the biological assessment is not a final, reviewable agency action.  WWP

8   opposes summary judgment arguing that a recent unpublished district court decision requires a

9   biological assessment for activities not deemed major construction activities.  WWP further argues

10  the biological assessment does not analyze the effects of the action.

11      The court will first address whether Defendants were required to prepare a biological

12  assessment.  ESA regulations state that preparation of a biological assessment is required for

13  "Federal actions that are 'major construction activities.'" 50 C.F.R. § 402.12(b).  The majority of

14  courts addressing the issue have found that a biological assessment is only required for major

15  construction activities.  *See, e.g.*, *Water Keeper Alliance v. United States Dep't of Def.*, 271 F.3d

16  21, 25 (1st Cir. 2001); *Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 811 (8th Cir. 1998);

17  *Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency*, 11 F.Supp.2d 529, 544 (D. V.I. 1998).

18  WWP argues these cases are unpersuasive in light of an unpublished decision issued by the District

19  of Hawaii that concluded an agency has an obligation to prepare a biological assessment if it

20  determines a listed species may be present in the area of the proposed action.  *See Ctr. for Food*

21  *Safety v. Johanns*, 2006 WL 2927121 (D. Haw. 2006).

22      This court agrees with the majority of courts cited above and finds that a biological

23  assessment was not required in this case.  Section 7(c) of the ESA mandates the preparation of a

24  biological assessment when a listed species may be present in a project area for an agency action

25  for which no contract for construction has been entered into.  16 U.S.C. § 1536(c).  The statute

26

34

1   requires the biological assessment to be completed before any contract for construction is entered

2   into and before construction begins on such action.  *Id.*  ESA regulations recognize this emphasis

3   on construction and state that a biological assessment is only required for major construction

4   activities.  *See* 50 C.F.R. § 402.12(b).  The regulations define "major construction activity" as "a

5   construction project (or other undertaking having similar physical impacts) which is a major

6   Federal action significantly affecting the quality of the human environment as referred to in

7   [NEPA]" 50 C.F.R. § 402.02.  As discussed above, NEPA requires the preparation of an EIS for

8   "major Federal actions significantly affecting the quality of the human environment." *See*  42

9   U.S.C. § 4332(c).  The court has previously determined Defendants complied with NEPA in

10  determining an EIS was not required.  Thus, Defendants were not required to prepare a biological

11  assessment.

12          The court will next address whether the biological assessment constituted final agency

13  action.  The APA provides for judicial review of final agency actions.  5 U.S.C. § 704.  "As a

14  general matter, two conditions must be satisfied for agency action to be 'final': First, the action

15  must mark the 'consummation' of the agency's decisionmaking process . . . .  And second, the

16  action must be one by which rights or obligations have been determined, or from which legal

17  consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations and internal

18  quotations omitted).

19          Pursuant to ESA regulations, a biological assessment "shall evaluate the potential effects of

20  the action on listed and proposed species and designated and proposed critical habitat and

21  determine whether any such species or habitat are likely to be adversely affected by the action *and*

22  *is used in determining whether formal consultation or a conference is necessary.*"  50 C.F.R. §

23  402.12(a) (emphasis added).  Here, the court finds the biological as sessment did not mark the

24  consummation of the agency's decisionmaking process.  Rather, formal consultation occurred that

25  resulted in a biological opinion.  The biological opinion represents the final agency action subject

26

35

to judicial review.  *See Oregon Natural Res. Council*, 476 F.3d at 1035-36 (citing *Bennett*, 520 U.S. at 177-78).  The court does not express any opinion as to whether a biological assessment constitutes final agency action in the absence of a biological opinion.  Even if the biological assessment in this case constituted final agency action, the court finds WWP has failed to meet its burden of showing a violation of the ESA.  WWP's conclusory assertions regarding the alleged deficiencies in the biological assessment are insufficient to defeat summary judgment.  WWP has not shown how the analysis in the biological assessment is deficient or what additional information should have been included.

IT IS THEREFORE ORDERED that WWP's Motion for Partial Summary Judgment (# 44) is hereby DENIED.

IT IS FURTHER ORDERED that Defendants' Cross-Motion for Summary Judgment (# 55) is hereby GRANTED.

IT IS SO ORDERED.

DATED this 18th day of April, 2008.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE